Willett vs. Andrews et als.

---

No. 12,977.

CHARLES H. WILLETT VS. M. D. ANDREWS, ET ALS.

SYLLABUS.

1. In petitory action plaintiff must recover on the strength of his own title, not on the weakness of his adversary's.

2.  If the case fails on the weakness and insufficiency of his showing title, it ought to end there and then, and consideration of the title presented by defendant, urged of the special defenses urged, becomes unnecessary.

3.  A son claiming inheritance from father alleged to be dead, must prove his death, or make out a case from which death may be legally presumed, else he fails on the issue raised as to his acquisition by inheritance.

4.  The death of an absentee who is less than one hundred years old, is not to be presumed.

ON APPEAL from the Fourth Judicial District Court for the Parish of Grant. *Machen, J.*

*Robert P. Hunter* for Plaintiff and Appellant.

*H. H. White* and *W. C. Roberts* for Defendants and Appellees:

Argued and submitted December 23, 1898.
Opinion handed down February 20, 1899.

The opinion of the court was delivered by

BLANCHARD, J.   This is a petitory action.   Plaintiff sues to be declared the owner of 161.63 acres of land on Big Creek in the parish of Grant.   A part of the town of Pollock is situated on the land, and on a tract immediately adjoining is located an extensive saw milling plant, giving employment to hundreds of people and being the seat of one of the largest lumber manufacturing industries in the State. It is as the result of the location of the mill at this point that the town of Pollock has sprung into existence.

In the olden time, before the building of the railroad on the line of which the mill is established, and before Pollock became a town, the land in controversy had very little market value.   It was of the character known as "long-leaf" pine lands, with fine timber upon it, valuable if accessible to a mill, almost valueless if not.

In consequence of a part of the town being upon it, the land is alleged and shown to be now worth several thousand dollars, whereas in the former time there is testimony to show it was once traded for a pistol, and on another accasion for a pony.

The enhancement of its value, while a source of profit to its holders, is, it would seem, the origin likewise of something in the nature of *trial* and tribulation, as this suit demonstrates.

Plaintiff's case is that he purchased the land from Elias B. Parker on the 10th of April, 1893; that some errors in this act of sale were, later, in the same year, duly corrected by another writing executed between the parties; that Elias B. Parker inherited the land from his father, Peter D. Parker, who is alleged to be deceased and of whom, it is averred, Elias was the sole and only heir; that Peter D. Parker inherited it from his father, Levi B. Parker, deceased, whose sole and only heir he is averred to have been; and that Levi B. Parker entered the land from the government of the United States and became the patentee thereof.

Due registry and inscription of all these muniments of title is alleged.

Certain of defendants, to-wit:—Malvina Dawden, Wiley Walker, J. Emmet Walker, James B. Wilmot, Thomas J. Walker, T. R. McDowell, B. Marras, James M. Rucker, John H. McNeely, Arthur Guinn and James Bennett, appeared in the case and by answer, after denying plaintiff's pretensions, set up title in themselves as follows:

That Levi B. Parker, deceased, entered the land from the United States government in 1860; that patent issued to him in 1861; that after the death of Levi B. Parker, his surviving widow, Sarah Parker, and his son, Peter D. Parker, sold the land about the year 1862 to Howard McKnight; that McKnight, on January 22, 1880, sold it to Mrs. Malvina Riley (now Dawden); that an error of description in this act of sale was afterwards corrected; that J. H. McNeely acquired a portion of the land on August 9, 1890, at sheriff's sale, in the suit of G. W. Bolton vs. Uriah Riley, who was the former husband of Mrs. Malvina Riley (now Dawden); and that, later, to-wit:—on April 30, 1891, the said McNeely acquired from the then Mrs. Uriah Riley a certain interest in the land which is described.

After this sale from Mrs. Riley (now Dawden) to McNeely, the latter sold part of his holding to certain of the defendants herein, to-wit:—J. B. Wilmot, and Wiley Walker, and Mrs. Riley sold to the other defendants, or to those from whom they acquired their holdings.

These defendants averred possession through themselves and the authors of their titles for more than thirty years, and pleaded the prescriptions of ten and thirty years.

Certain of defendants who were cited, to-wit:—Dan White, Thomas Shafer, M. D. Andrews, Sim Thomas, John W. McClure, Dan Mead,

·Oscar Hammock and John Williams, made no appearance and filed no answer.

The case went to trial as to them on default duly entered.

The judgment of the court a qua rejected plaintiff's demand outright as to those defendants who had set up title, and rejected it as in case of non-suit as to those who, while cited, had filed no appearance and set up no title. In other words, plaintiff's title as presented was decreed *deficient,* and that set up by certain of the defendants *sufficient.* The pleas of prescription were not passed upon.

Plaintiff appeals.

If a plaintiff in a petitory action succeeds, it must be upon the strength of his own title, not upon the weakness of his adversary's.

Has the plaintiff herein made out such a showing of ownership as entitles him to recover, unless defendant's title prove the stronger and better?

We do not think he has.

That part of his case relating to his vendor Elias B. Parker's acquisition of the land sued for by inheritance from his father, Peter D. Parker, fails of proof.

Peter D. Parker's death is not shown.

Not only is it not shown, but no sufficient facts and circumstances .are exhibited warranting even the presumption of his death.

But, if dead, it is by no means certain that he, Peter D. Parker, was at the time of his death the sole surviving heir of Levi B. Parker, his predeceased father.

Levi B. Parker had, in 1860, acquired the land by entry, followed, in 1861, by patent, from the United States.

He took possession, made some improvements and lived upon it with his family until 1863 or 1864, when he removed to Concordia Parish, opposite Natchez, Mississippi, taking his family with him. He and three of his children died there on Lake Concordia in 1864, and another son appears to have died about that time in Natchez. This left, surviving, his widow, Sinah Parker, a son, Peter D. Parker, then about 22 years of age, another son, Marr Parker, and a daughter, Elmira, then 10 or 12 years of age.

These four returned to Big Creek, near their old home, where the ·son, Marr Parker, died.

The mother, with Peter D. Parker, and the girl, Elmira, then, about the year 1865, removed to the State of Texas.

Before the family removed to Concordia parish, Peter D. Parker, then a youth of about 20 years, contracted marriage with Mary Blackman, a girl living in the same neighborhood, and the couple lived together as man and wife from the date of their marriage, May 14th, 1862, until October, 1863. About the latter date the husband seems to have left her permanently.

Considering herself abandoned, hearing nothing from her husband and believing him to be dead, the wife, a number of years later, contracted a second marriage with a man named Cooper.

She still survives and was a witness in the case.

After Peter D. Parker abandoned his wife in October, 1863, a son was born to her in January, 1864. This son is the Elias B. Parker from whom plaintiff claims to have derived title.

When Peter D. Parker left his wife in 1863, he is supposed to have gone with his father and the family to Concordia, though the wife, in her testimony, speaks in one place of his having gone off to the war, and, in another, of his having "just went off to the Yankees and left me."

But the evidence otherwise establishes that it was about this time Levi B. Parker removed to Concordia, and it is shown that the son, Peter D. Parker, went along with the family.

There is nothing to show the wife ever saw Peter D. Parker after he left her in October, 1863, though he returned to the same neighborhood from Concordia parish and remained there some little time before emigrating, with his mother and sister, to Texas.

The record discloses nothing of a positive character concerning the Parkers after they left for Texas. What became of them is not known. Peter D. Parker, at the time of the emigration, was not over 23 years of age, and his sister Elmira not over 12 years. There is nothing to indicate the age of the mother, Mrs. Sarah Parker.

At the time this case was decided in the court below, June, 1898, thirty-three years had elapsed since Peter D. Parker removed to Texas.

But adding these to the 23 years of his age when he left, would show him, if living, to be now only 56 years old, an age at which death, as the district judge properly held, could not be presumed under any ordinary circumstances.

A similar calculation shows his sister, Elmira, if living, to be only

45 years of age at this time, and the non-presumption of death applies with even more force as to her.

The land in controversy having been acquired by Levi B. Parker during his marriage with Sinah Parker, the same fell into the community of acquets and gains, so that as widow in community she owned an undivided one-half interest in the land.

This interest, it is claimed by defendants, she conveyed, as did Peter D. Parker his interest, to Howard McKnight, just prior to their departure for Texas. As to this there is vigorous opposition on part of plaintiff. But leaving this phase of the controversy out of consideration for the time being, if Mrs. Parker did not dispose of her interest to McKnight, then she owned it at the time of her departure for Texas. There is no proof of her death, as there is none of the death of Peter D. Parker, or the daughter Elmira.

If Mrs. Parker, the mother, be still alive, she, of course, owns (unless the conveyance to McKnight be held good) her half interest in the property, and no part of it has descended by inheritance to either Peter D. Parker, or his son Elias B. Parker.

If Peter D. Parker be alive, his inherited interest in the property (unless conveyed to McKnight or some other vendee) is still in himself, and his son Elias B. Parker has as yet no inherited interest in and to the same, and having none could convey none to plaintiff.

As to the daughter Elmira, if alive, she, of course, holds her interest. She was a minor when the conveyance to McKnight is said to have been made, and did not join in the same.

If she is dead, when did she die; had she married and borne children before her death; if dead, did she die before or after her mother's death, supposing the latter to be dead?

These are pertinent questions to ask and they are not answered by the record. Mrs. Elizabeth McKnight, a reputable witness, widow of Howard McKnight, to whom it is claimed by defendants the Parkers sold the land before going to Texas, testifies that some six or eight years after they went to Texas her husband received a letter from a man claiming to be the husband of Elmira Parker, making enquiry about the land, its value, etc.

There is no sufficient proof warranting the court in holding any of these parties dead, and we must necessarily so hold before we could decree plaintiff entitled to recover, if he be otherwise entitled to re-

cover, as to which we express no opinion, none being necessary to the determination of the case as presented, in the view we take of it.

Nothing beyond rumored reports of the death of Mrs. Sinah Parker, Peter D. and Elmira is disclosed by the evidence.

The wife of Peter D. Parker had heard these reports, and believing them, and justifying herself by the lapse of time and the non-appearance of her husband, and no information from him or concerning him, she married again. But this circumstance adds nothing to the weight of the rumors relative to his death. She simply "believed he was dead strong enough to marry again." This is her language. She "took what she heard to be true and never heard anything to the contrary."

There was one witness, Mrs. L. A. Bryan, who testified the family all had chronic diarrhœa when they left for Texas, and that the members of the family who had died at or near Natchez succumbed to that disease. But it by no means follows that because Mrs. Parker, her son Peter and her daughter Elmira were suffering from the ailment mentioned when they left for Texas, that they died of it. Mrs. Bryan testifies to reports she heard of the death of these parties after reaching Texas. But whence came these reports, how originated, through what channels disseminated, etc., she, as well as all other witnesses examined touching the fact of death, could say nothing.

A witness by the name of Cotton, the brother of Elias B. Parker's mother, says he heard the reports relative to the death in Texas of Peter D. Parker. Further than this knew nothing whatever about his death.

Willett, the plaintiff, testifies to going himself to Texas; went into three or four counties; went "where they said he had gone (meaning Peter D. Parker) in Shelby county."

Who "they" were who said this, he does not enlighten us.

Continuing he says:—"I went to the place where they said Peter Parker was and where they said he died. This was Cherokee county. This was in 1884. I did not find Peter Parker there. I saw a cousin, or said to be a cousin, of his. I enquired for Peter Parker. He told me that Peter Parker had come in there and his mother along, I understood him to say, in 1864 or 1865. He said they both died there. He told me that Peter Parker had told him the little girl had died before they got to Texas. The man's name was Mitchell, a cousin on the mother's side."

The foregoing is all the testimony the record contains relative to the death of the three members of the Parker family who emigrated to Texas. From it we are asked to assume their deaths. To do so would be to give effect to rumors and reports, vague and uncertain, and to testimony purely hearsay.

The man Mitchell, the cousin in Texas, was not called as a witness, nor was any effort made to take his testimony. If Peter D. Parker died in Cherokee county it would seem that some one might have been found there who could testify to his death positively.

Mitchell, the cousin, did not tell plaintiff he personally knew of the death of Parker, confining himself, merely, to saying he and his mother had died out there.

How he knew this does not appear, and we can not supply it by conjecture.

In Martinez vs. Succession of Vives, 32 La. Ann. 305, it was held the death of an absentee who is less than one hundred years old is not to be presumed. It must be legally established. This doctrine is fully borne out by the authorities there cited.

We must hold the evidence fails to establish the death of these parties, and with this failure plaintiff's case falls.

It would appear that in "the sixties" two Peter Parkers figured in that section of the country now comprising the parishes of Grant and Catahoula—another besides the Peter D. Parker whose life we have been tracing.

This other one seems to have lived and died in Catahoula parish. That *he* is dead is fully established by the testimony. He appears to have developed too great a propensity for "gathering where he had not sown," and on this account he was, soon thereafter, called upon to make his exit by the hempen process, from this terrestrial life. He was hanged for horse-stealing, just after the close of the war, on Funny Louis Creek in Catahoula parish. "Judge Lynch" seems to have issued the warrant.

But beyond doubt he was not the Peter D. Parker who married Mary Blackman in 1862, and whose son Elias B. Parker, plaintiff's vendor, is.

In Rowson vs. Barbe, a petitory action very recently decided and not yet reported, it was said "plaintiffs advancing to the attack on defendant's possession as owner find themselves repulsed and beaten back at the threshhold by the weakness of their own line. They retire

discomfited without having developed the weakness, if any, of defend-
ant's position. They must show before the possessor can be put on
his defense, a legal title to the premises in dispute. In this view of
the case it is unnecessary to consider the various objections urged
against defendant's showing of title, and equally unnecessary to re-
view the several grounds, including prescription, urged in support of
her title."

It was then held that plaintiffs having failed because of the weak-
ness and insufficiency of the title they presented, it ended the case,
and it was error for the trial judge to go further and pass judgment
rejecting the defense of prescription set up in the answer—this on
the ground that the case fell before consideration of the defense be-
gan.

The doctrine and ruling of the court in that case are approved and
as far as applicable will be permitted to govern the instant case.

The District Judge properly held the case to be against the plain-
tiff on the issue of the inheritance of the property by his vendor from
Peter D. Parker; that the latter not having been shown to be dead, it
could not be determined that the son, Elias B. Parker, had acquired
anything from him by inheritance.

The case should have ended there and then by a judgment of non-
suit against plaintiff, and without passing upon the special defenses
set up in defendants' answer.

Indeed, while defendants, on whose behalf answer was filed, set up
title in themselves and invoked the law of prescription in support
thereof, they did not pray for the judgment of the court on the title
thus presented, nor on their plea of prescription. They merely asked
rejection of plaintiff's demand and for judgment for the value of im-
provements erected on the property, and for the taxes paid by them, in
case of eviction.

It, therefore, becomes necessary to amend the judgment of the court
a qua.

For the reasons assigned, it is ordered, adjudged and decreed that
the judgment appealed from be so amended as to reject plaintiff's de-
mand, as in case of non-suit, as to all the defendants, and to dismiss
his action with costs of the lower court.

It is further ordered, etc., that in other respects the aforesaid judg-
ment be avoided and reversed, and that there be judgment of non-suit
on the remaining demands of defendants set up in their answer, in-

cluding prescription, costs of appeal to be borne by those appellees in respect of whom the judgment is amended in part and reversed in part.